IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ELSIE M. DAVIDSON,

        Plaintiff,

vs.                                              No. CIV 04-32 LFG

TOMMY G. THOMPSON, Secretary of
the United States Department of Health
and Human Services,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
**REVERSING ADMINISTRATIVE DECISION**

THIS MATTER comes before the Court on Plaintiff's request under 42 U.S.C. § 405(g) and 42 U.S.C. § 1395ff(b), to reverse a final administrative decision of Defendant Secretary of Health and Human Services ("the Secretary") denying Medicare reimbursement for a closed-circuit television ("CCTV") electronic vision enhancement device prescribed for Plaintiff Elsie M. Davidson ("Davidson") by her doctor.

The parties consented to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636 (c) and Fed. R. Civ. P. 73(b), and a briefing schedule was established. Davidson filed her opening brief [Doc. 9] on April 29, 2004. The Secretary responded [Docs. 10, 11], and Davidson filed a reply [Doc. 12]. The matter is now fully briefed, and the Court determines that a hearing is not necessary. For the reasons given below, the final decision of the Secretary is reversed.

**Factual Background**

The facts are not in dispute. Davidson is an 88-year-old woman, covered by Medicare. In late 1997, she suffered a sudden macular hemorrhage resulting in macular degeneration, "a retinal disorder destroying all but her peripheral vision." Brisson v. Dep't of Social Welfare, 167 Vt. 148, 150, 702 A.2d 405, 407 (1997). Davidson describes this condition in her brief-in-chief, as follows:

> Macular degeneration is an impairment on the macular lutea, a small but critical section of the retina of the eye. It is responsible for "central vision," the ability to see and distinguish objects in the center of a person's field of vision. The macula lutea enables individuals to read printed matter, recognize faces and myriad other things, and focus on small objects.

Plaintiff's Brief in Support of Reversal [Doc. 9], at 4 n.7. As the Secretary does not challenge this description, the Court assumes it to be accurate.

Despite emergency surgery following the hemorrhage, Davidson lost most of the functioning in both of her eyes and was certified as legally blind. *See*, Memorandum from Dr. Robert W. Reidy, M.D., Davidson's treating physician [Administrative Record, at 11; hereinafter referred to in the format, "AR 11"]; Statement of Legal Blindness [AR 10].

On June 26, 1998, Dr. Reidy prescribed a CCTV for Davidson, noting that the device "would greatly enhance her quality of life in that, with her limited peripheral vision, she would be able to read some print such as prescriptions, etc." [AR 11]. Davidson thereafter purchased an "Aladdin Rainbow" CCTV, manufactured by a company called TeleSensory, at a cost of $3,221.99. [AR 45-47; 182]. CCTVs are described in Brisson v. Dep't of Social Welfare, *supra*, 702 A.2d at 408, as follows:

> In contrast to eyeglasses, CCTVs are designed for use by the legally blind. For patients like Lorraine Brisson who suffer from macular

> degeneration, which destroys all but their peripheral vision, a CCTV is a necessity. Ordinary magnifying equipment does not enlarge print to a sufficient size and clarity to allow such patients to read; CCTVs are the only available treatment.

Davidson underwent training in the use of the device with the assistance of Dr. Reidy and the New Mexico Commission for the Blind. [AR 41]. She says that she uses the CCTV for such things as:

> reading mail, reading prescriptions and instructions for taking medicines, reading phone numbers, instructions for preparation of food, reading letters I have written for correction of grammar and spelling, reading monthly bank statements, reading clothing tags which give cleaning and washing instructions. I could not do this without the Aladdin Rainbow CCTV.

[AR 41]. Promotional material for the Aladdin Rainbow device notes that its "unusually large depth of field permits 3-dimensional objects such as prescription bottles and curved surfaces to be easily read." [AR 45].

Davidson now seeks reimbursement for the expense of the CCTV under Medicare Part B. She contends that the device is covered under either or both of two categories – as "durable medical equipment" ("DME")[1] or as a "prosthetic device."[2] The Secretary contends that a CCTV is neither a DME nor a prosthetic device and, furthermore, CCTVs fall within a category, "eyeglasses," which is statutorily excluded from coverage.[3]

## Procedural Background

Medicare is a national health insurance program, consisting of Part A, which provides

---

[1] *See*, 42 U.S.C. §§ 1395k(a)(1), 1395x(n), 1395x(s)(6); 42 C.F.R. § 414.202.

[2] *See*, 42 U.S.C. §§ 1395k(1)(1), 1395x(s)(8); 42 C.F.R. § 414.202.

[3] *See*, 42 U.S.C. § 1395y(a)(7).

3

coverage of institutional health services for eligible individuals; and Part B, a supplemental insurance program that affords coverage of physicians' services and various other health services, defined to include DME and prosthetic devices. Persons seeking to challenge a determination by a Medicare carrier denying coverage for a DME or prosthetic device must steer through an elaborate procedural maze. Exhaustion of these procedures is required prior to judicial review. Heckler v Ringer, 466 U.S. 602, 605-06, 104 S. Ct. 2013, 2016-17 (1984). The Court finds that Davidson has fully exhausted her administrative remedies, as detailed below.

Following Medicare procedures, Davidson submitted a claim under Medicare Part B for reimbursement for the cost of the CCTV which her doctor prescribed. The claim was filed in October 1988 [AR 185] with the appropriate Durable Medical Equipment Regional Carrier, known as Palmetto Government Benefits Administrators ("Palmetto GBA"). *See*, 42 C.F.R. § 421.210.[4] Palmetto GBA, acting as agent for the Secretary, determines whether claims submitted by Part B enrollees meet Part B coverage criteria. Id.; 42 U.S.C. § 1395u; Chipman v. Shalala, 894 F. Supp. 392, 393 n.2 (D. Kan. 1995).

Palmetto GBA denied Davidson's claims. The initial refusal, dated March 26, 1999, was based on grounds that "Medicare does not pay for this item or service." Medicare Summary Notice [AR 183]. Davidson appealed this decision to the carrier, as required by Medicare regulations. Her appeal was turned down by notice dated September 17, 1999, on the stated basis that "Medicare does

---

[4]The Secretary of Health and Human Services ("HHS") is charged with administering the Medicare program and has delegated this authority to the Administrator of Health Care Financing Administration ("HCFA"). HCFA contracts with private insurance carriers to administer Part B claims. "Durable Medical Equipment Regional Carriers" (DMERCs) are responsible for processing DME and prosthetic device claims. The carriers make coverage determinations in accordance with the Medicare Act and implementing regulations, and with guidelines issued by HHS or HCFA such as the Medicare Part B Carrier's Manual and the DMERC Supplier's Manual.

not pay for this item. Unfortunately, a closed circuit television low vision aid is a non-covered item under current Medicare guidelines." [AR 179]. Davidson then requested a hearing with the carrier's hearing officer. [AR 178].

The in-person hearing was held on February 22, 2000. The hearing officer, Anna M. Leuenberger, R.N., affirmed denial of coverage by notice dated April 4, 2000. She found that a CCTV is neither "durable medical equipment" ("DME") nor a "prosthetic device" as defined in Medicare regulations. This ruling was based on her determination that CCTVs do not qualify as prosthetic devices, because they "will not improve the condition or retard the deterioration of the beneficiary's eye" and because they do not "replace all or part of an internal body organ." Furthermore, she held, the device does not qualify as DME, because:

> It is a low vision aid and not covered by Medicare . . . . The CCTV does not treat the eye condition, slow the deterioration process, or replace all or part of any internal organ. The CCTV is also useful to persons without an illness or injury and is used for a variety of reasons including close monitoring of distant areas, crafts, and artwork.

[AR 173].

Upon receipt of this decision, Davidson requested a hearing with a Social Security Administration Administrative Law Judge ("ALJ"). [AR 170]. The hearing was held one year later, on April 27, 2001, before ALJ Mary Ann Lunderman. [AR 186-201]. Witnesses at the hearing in support of the claim were Davidson herself, her husband Don Latimer, and Debbie Gonzales, a representative from the New Mexico Commission for the Blind. Also present at the hearing was Dr. Robert M. Zone, described by the ALJ as "an expert witness . . . [who] has a great deal of experience with Medicare and the benefits that Medicare will pay for." [AR 187].

At the beginning of the hearing, the ALJ stated:

5

>the general opinion, I will be very honest with you, is that this type of equipment does not qualify as a piece of durable medical equipment. And, it's very unfortunate. But, what the appeals council has said in cases like this, that, even though it may be true that the beneficiary . . . uses the closed circuit television to do things they would not otherwise do because of their . . . visual impairment, I'm sorry, this does not demonstrate that the closed circuit television . . . has a medical purpose, as a method of treatment to restore or improve the actual functioning of the eyes. Improving the ability to read through magnification does not improve the underlying condition of the eye. Therefore, it's not found to be durable medical equipment or prosthetic device. And, typically, this kind of equipment is not covered.

[AR 188-89].

After making this opening statement, the ALJ heard the witnesses. On June 12, 2001, she issued her opinion upholding the denial of coverage. She found that the CCTV is not a DME:

>because its primary and customary uses do not serve a medical purpose. It is non-medical, meaning that it is primarily and customarily used for a non-medical purpose. The device is considered an environmental control and self-help aid. Environmental control equipment is equipment that enhances the environmental setting in which the beneficiary is placed. Self-help equipment is primarily used as a convenience aid. Other examples of equipment used to aid vision impaired Medicare beneficiaries that are not covered by Medicare are white canes, Braille reading texts, and in-home safety grab bars.

[AR 36].

The ALJ further found that the CCTV is not a "prosthetic device," based on statements in the DMERC Supplier Manual to the effect that "[l]ow vision aids are noncovered items" and "[t]hese aids are used to maximize residual vision rather than replace 'all or part of an internal body organ' and therefore do not meet the definition of a prosthetic device." She concluded that the CCTV "is considered to be a low vision aid" and is therefore "expressly excluded" from Medicare coverage. Although noting that it "does not establish a precedent," the ALJ also cited a recent decision by the

6

Medicare Appeals Council ("MAC") in which the MAC held that a CCTV does not have a "medical purpose as a method of treatment to restore or improve the functioning of [patient's] eyes . . . [and] does not improve the underlying condition of the eye." [AR 36].

Davidson appealed the ALJ's ruling. In her July 21, 2001 letter to the Medicare Appeals Council requesting review, she noted *inter alia* that she takes seven different medications, "and it is only by using the CCTV that I can distinguish the types and dosages of these medications or read the prescription or drug instructions." [AR 6]. She also noted that Dr. Robert M. Zone, the medical expert at the ALJ hearing, was not qualified to testify on blindness as he specializes in urological surgery. [AR 7]. The record indicates that Dr. Zone is a retired urologist. [AR 51].

On November 6, 2003, over five years after Davidson filed her initial claim, the Medicare Appeals Council issued its ruling denying the request for review. The Council did not discuss the ALJ's rulings regarding DMEs and prosthetic devices but based its ruling on a finding the CCTVs are "excluded by the provisions of Section 1862(a)(7) of the Social Security Act." [AR 1]. No other reasoning was given. Section 1862(a)(7) of the Social Security Act is codified at 42 U.S.C. § 1395y(a)(7), and provides as follows:

> No payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . where such expenses are for routine physical checkups, eyeglasses (other than eyewear described in section 1395x(s)(8) of this title) or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, procedures performed (during the course of any eye examination) to determine the refractive state of the eyes, hearing aids or examinations therefor, or immunizations . . . .

Following receipt of the Appeals Council decision, Davidson filed this action seeking judicial review pursuant to 42 U.S.C. § 1395ff(b). The Court finds that Davidson has exhausted her

administrative remedies.

## Discussion

The Medicare program is set forth in Title XVIII of the Social Security Act, codified at 42 U.S.C. § 1395 *et seq.* Davidson seeks reimbursement under Medicare Part B, "Supplementary Medical Insurance Benefits for Aged and Disabled." As noted above, she argues that the CCTV device is eligible for reimbursement under Part B as a piece of "durable medical equipment" or as a "prosthetic device," as these terms are defined in the Medicare statute and regulations. The Secretary contends that the device does not fall within these categories and, furthermore, that it comes within a group of items and services specifically excluded by statute.

The Secretary correctly points out that:

> the statute and regulations are silent as to whether a CCTV qualifies as a DME or prosthetic device. There is no explicit inclusion in the statute or regulations identifying a CCTV as DME or prosthetic device. [Nor is there an explicit exclusion of CCTVs]. The Medicare statute does not define the term CCTV. Furthermore, the Medicare statute is silent as to whether 42 U.S.C. § 1395y(a)(7) [the statutory exclusion for "eyeglasses"] applies to sophisticated low vision devices such as CCTVs.

[Doc. 10, at 11]. The Secretary argues that, the statute being ambiguous, the Court must therefore apply the highly deferential standard of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984) to the adjudication involved in this case. The Court does not agree.

Chevron holds that when the meaning of a statute is ambiguous, an agency's interpretation of the statute will be upheld, so long as it is reasonable. The Chevron case involved an agency's interpretation of a statute as embodied in duly promulgated regulations. This case, on the other hand,

8

involves an agency adjudication and is governed by the standard set forth in Chipman v. Shalala, 90 F.3d 421, 422 (10th Cir. 1996), that is, "Looking at the administrative record as a whole, we may overturn the Secretary's decision only 'if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law.'" Applying that standard, the Court finds that the Secretary's decision is not supported by the record as a whole nor by the applicable law and will therefore be reversed.

Furthermore, as discussed in more detail below, the ALJ's decision and the Appeals Council's ruling upholding that decision rely on internal agency interpretations of the Medicare statutes, interpretations which have not undergone the rigorous and transparent notice-and-comment process required for formal rulemaking. While agency interpretations of this sort are entitled to some deference, nevertheless:

> [the] presumption of regularity . . . is not [meant] to shield the agency's action from a thorough, probing, in-depth review . . . . An agency's interpretation of its own regulations may well be entitled to 'substantial deference'; but it nevertheless will be set aside if it is the product of a decisionmaking process deemed arbitrary or capricious, or if it lacks factual support."

Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574, 1575-76 (10th Cir. 1994) (some internal punctuation omitted).

> Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant Chevron-style deference . . . . Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161 (1944), but only to the extent that those interpretations have the "power to persuade."

Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 1663 (2000).

*See also,* United States v. Atandi, 376 F.3d 1186, 1190 n.8 (10th Cir. 2004) ("An agency's internal interpretive guidelines do not warrant *Chevron* deference"); and Rodriguez v. Whiting Farms, Inc., 360 F.3d 1180, 1189 (10th Cir. 2004), holding that the Court may look "for guidance" to the judgment of an agency employee contained in opinion letters; however, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control," *quoting* Skidmore*, supra*, 323 U.S. at 140.

With these standards in mind, the Court turns to a review of the Secretary's ruling.

A.  Durable Medical Equipment

Davidson contends, first, that the CCTV is covered as a piece of durable medical equipment ("DME"). Medicare Part B will reimburse patients for expenses incurred for "items or services" provided they are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. §§ 1395k(a), 1395y(a)(1)(A); 42 C.F.R. § 411.15(k). Reimbursable items include "durable medical equipment" which is used in the patient's home. 42 U.S.C. § 1395x(n), 1395x(s)(6); 42 C.F.R. § 410.38.

An item is a DME if it: (1) can withstand repeated use; (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury; and (4) is appropriate for use in the home. 42 C.F.R. § 414.202.

The CCTV at issue in this case weighs 50 pounds and is made of durable material. Davidson has used it, in her home, many times over the course of several years. The parties do not dispute that it can "withstand repeated use" and that it is "appropriate for use in the home." The parties do,

10

however, dispute whether the CCTV is primarily and customarily used to serve a medical purpose, and whether it is useful to an individual in the absence of an illness or injury.

The Secretary contends that the primary and customary use of a CCTV does not serve a medical purpose, but instead it is "an assistive device used to enhance an individual's environment" and a "self-help aid that is not covered by Medicare." [Doc. 10, at 12]. The ALJ acknowledged that the CCTV may enable a beneficiary to do things (such as read the timing and dosages on her prescription medications) which she could not otherwise do because of her visual impairment. However, the ALJ further found that this circumstance "does not demonstrate the closed circuit television has a medical purpose as a method of treatment to restore or improve the functioning of their eyes. Improving the ability to read does not improve the underlying condition of the eye." [AR 36].

The Secretary argues that he "review[ed] . . . the nature and functions of the CCTV" and concluded it is an assistive device which merely provides comfort to the individual and helps out with the activities of daily living, and does not serve a medical purpose. [Doc. 10, at 13]. But simply because a device provides comfort and help with daily activities does not rule out its also serving a medical purpose. The dispositive issue is whether the device or treatment "primarily and customarily" serves a medical purpose, and it is here that the Secretary failed to consider all of the evidence on the record.

Dr. Zone, a government witness who testified at the ALJ hearing, stated that in order to be considered a DME as defined by Medicare, the equipment "has to be uniquely medical," that is, not of use to a person in the absence of illness or injury. The CCTV does not meet this requirement, he said, because "this device can be used and actually is used by some people for its magnification, for

11

working on the fine items and things of that sort." [AR 193]. However, Ms. Gonzales, the representative from the New Mexico Commission for the Blind, stated that CCTVs are not particularly useful to anyone who is not legally blind, because a CCTV magnifies the target material over sixty times while restricting the field of view. She said there are other devices which would be more useful for normally-sighted persons. [AR 197].

There is no other evidence on the record to indicate that CCTVs are not used "primarily and customarily" for persons with medical needs. Dr. Zone seemed to imply in his testimony that the CCTV device is used by hobbyists and other casual users, as a kind of fancy magnifying glass. But he did not support this statement with any data, nor did he disclose the facts or other information that support his opinion. He may be a very good urologist, but he is not a specialist in ophthalmology and there is no indication on the record that he has any expertise in dealing with patients who are legally blind or have macular degeneration, nor any evidence to support his statement that normally-sighted persons use these very expensive devices "for working on the fine items and things of that sort." The promotional material for the Aladdin Rainbow device, which is part of the record, makes not mention of any use for "working on fine items" or pursuing crafts or hobbies. [AR 12-13]. If the device were widely used in this manner, one would expect that the manufacturer's marketing efforts would be targeted to such use.

Davidson's husband pointed out at the hearing that hospital beds, which are reimbursable by Medicare, are sometimes used by people who are not ill or injured but simply because the beds are comfortable and people like to crank them up and down. Dr. Zone confirmed that Medicare does pay for hospital beds, and that some people do use such beds for comfort or convenience. [AR 194-95]. Thus, the fact that a device could conceivably be used by persons who do not have a medical need

12

for the device should not disqualify an item from coverage as DME. The relevant question is whether the device is "primarily and customarily" used by persons with medical needs. In this case, Davidson's doctor prescribed the CCTV specifically due to her serious medical condition. It was not prescribed as a hobby aid, to assist in the creation or arts and crafts, or to "work on the find items or things of that sort." There is no record support for the notion that CCTVs are not primarily used by persons with a medical need for the device.

The Court finds the Secretary's ruling that the CCTV is not durable medical equipment to be arbitrary and capricious and unsupported by substantial evidence.

B.  Prosthetic Device

Also reimbursable under Medicare Part B are "prosthetic devices." 42 U.S.C. § 1395k(a)(2)(I). These are defined in the Medicare statute and regulations as devices that "replace all or part of an internal body organ." 42 U.S.C. § 1395x(s)(8); 42 C.F.R. § 414.202. This definition was interpreted by Palmetto GBA's hearing officer to mean devices which "replace all or part of the function of a permanently inoperative or malfunctioning internal body organ." [AR 172].

This interpretation – that the prosthetic device is one which replaces the function of a body part, not just one which replaces the organ itself – is in keeping with the Act's requirement that items and services must be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member" in order to be reimbursable. 42 U.S.C. § 1395y(a)(1)(a); 42 C.F.R. § 411.15(k)(1). It is also in keeping with a common sense interpretation that "the ordinary meaning of a prosthetic device [is one] designed to replace the functioning of a malfunctioning body part," Baker v. Tomkins Industries, Inc., 339 F. Supp. 2d 1177 (D. Kan. 2004) (dealing with coverage for prosthetic devices under an employer's health plan), and the fact, as

reported in The Braille Monitor for November 1997, that "the American Academy of Ophthalmology recognizes the CCTV as a prosthetic device."  [AR 165].

The ALJ cited in her opinion a non-precedential decision of the Medicare Appeals Council holding that a CCTV does not have a "medical purpose as a method of treatment to restore or improve the functioning of [patient's] eyes . . . [and] does not improve the underlying condition of the eye."  [AR 36].  But the Secretary cites no legal authority that requires a device to "restore" the functioning of a defective body part or "improve its underlying condition" in order to qualify as a prosthetic device, and the Court has not found any legal support for that proposition.

The Secretary also argues that the DMERC Supplier Manual, Chapter IX, P IX-42-IX-46, specifically excludes CCTVs from coverage as prosthetic devices.  The manual, as quoted by the ALJ, does not specifically refer to CCTVs; rather, it states that "low vision aids are noncovered items" because they "are used maximize residual vision rather than replace 'all or part of an internal body organ.'"  [AR 36].  But, as noted above, a prosthetic device need not replace a body part; it is sufficient if it replaces the organ's functions.

That, indeed, is exactly the reason Davidson's physician prescribed the CCTV.  The very purpose of the eye is to see, and it is undisputed that the CCTV significantly assists Davidson to seeing things, *i.e.*, prescription labels, emergency telephone numbers, letters, etc., that she could not see before.  Thus, the CCTV improves the functioning of her eyes' abilities to see.

Furthermore, as noted above, provisions of the Medicare manuals are not law, but rather are interpretations by the Secretary of statutory and regulatory provisions:

> [T]he Claims Manual is not a regulation.  It has no legal force, and it does not bind the SSA.  Rather, it is a 13-volume handbook for internal use by thousands of SSA employees, including the hundreds

14

> of employees who receive untold numbers of oral inquiries like respondent's each year.

Schweiker v. Hansen, 450 U.S. 785, 789, 101 S. Ct. 1468, 1471 (1981).  *See also*, Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998), describing the Medicare Carriers' Manual as "extrinsic material," as opposed to legal authority, which could under some circumstances convert a motion to dismiss into a motion for summary judgment under Fed. R. Civ. P. 12(b).  Thus, while the manual provisions are entitled to some deference, they are not binding on this Court.  They are not even entitled to full Chevron deference but will be considered only "for guidance."  Rodriguez v. Whiting Farms, Inc., *supra*; Christensen v. Harris County, *supra;* United States v. Atandi, *supra.*

At the hearing, Davidson told the ALJ that the CCTV enabled her to have a degree of independence she could not hope to achieve without the device and said she felt that it did indeed "improve the function" of her eyes.  [AR 191].  Davidson's husband stated that he felt the CCTV enables Davidson to do many things she could not otherwise do, and that it "replaces the function of the eye."  [AR 189].

Debbie Gonzales, the representative from the New Mexico Commission for the Blind, stated that, while a CCTV does not technically "medically trea[t] the eye," it nevertheless improves the function of the vision for persons with macular degeneration.  She said that macular degeneration results in loss of a special part of the vision, the "sharp vision," and the CCTV enables the patient to control the contrast of what she is reading and the amount of magnification, and by these means to make the most of her remaining vision and "function more normally."  [AR 197].  She stated further that the CCTV isn't just a tool for reading but rather, for persons with macular degeneration, it enhances the visual functioning of the eye.  [AR 198].  There is substantial evidence on the record

15

to support Davidson's assertion that the CCTV does, in fact, replace or enhance the function of the eyes for persons with macular degeneration, and there is no evidence to the contrary.

Even applying some deference as the Court is bound to do, the Court finds that under the circumstances of this case, the Secretary's interpretation of the "prosthetic device" provision is arbitrary and capricious and unsupported by the record.

C. <u>Statutory Exclusion of "Eyeglasses"</u>

Although the ALJ relied on the definitions of DME and prosthetic device to deny coverage, the Appeals Council denied Davidson's request for review and upheld the ALJ's decision on grounds that "the CCTV supplied to the appellant is excluded by the provisions of section 1862(a)(7) of the Social Security Act."

The statutory section referred to in the Appeals Council's denial letter is codified at 42 U.S.C. § 1395y(a)(7) and, as noted above, establishes an exclusion from coverage for "eyeglasses," as well as for "routine physical checkups . . . eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, [and] procedures performed (during the course of any eye examination) to determine the refractive state of the eyes." The Appeals Council includes no analysis in its denial letter; it merely cites the statute. However, the Secretary, in his briefing on this case, points to two ALJ opinions in other Medicare adjudications involving CCTVs which, although non-precedential, reveal the reasoning behind the Secretary's inclusion of CCTVs in the category of "eyeglasses." [Doc. 11 and attachments thereto].[5] Both of these adjudications arose in Florida and both were decided on the same day, March 28, 2003, on identical reasoning.

---

[5]The Court notes also that earlier ALJ opinions concluded that CCTVs were eligible for Medicare coverage. [*See*, AR 16-29]. No intervening change in the statute or regulations accounts for this inconsistency.

In these cases, the Appeals Council noted that "Claims for CCTVs present a recurring issue of adjudicative significance," and the Council therefore solicited a position paper from the Centers for Medicare and Medicaid Services (CMS). The Chief of the Beneficiary Services Branch in Dallas, Texas responded in a memorandum dated December 12, 2002. In this memorandum, the chief stated that although "there exists no national or regional coverage policy specifically addressing CCTVs," she nevertheless was of the opinion that CCTVs are encompassed within the statutory exclusion for eyeglasses as "these devices serve the same function as eyeglasses." [Doc. 11, Ex. A at 2]. The author of the memorandum also noted that the eyeglasses provision constitutes "an overriding statutory exclusion," because of language in the statute stating that "notwithstanding any other provision of the Medicare Act," no payment may be made for any expense incurred for certain specified items, including eyeglasses. [Doc. 11, Ex. A, at 2-3].

In the two Florida cases, the Appeals Council expanded on the reasoning set forth in the CMS memorandum to the effect that CCTVs serve the same function as eyeglasses. It did so by consulting the American Heritage Dictionary of the English Language, 4th edition. The Appeals Council concluded that the definitions of the terms eyeglasses, eyepiece, ocular, optical, and lens, as set out in the dictionary, "indicate that the statutory exclusion of eyeglasses in section 1862(a)(7) of the Act is an exclusion of the lens, which is the functional part of an eyeglass and the part that aids vision; it is not merely an exclusion of eyewear."

The Appeals Council acknowledged that "[a] closed-circuit television device differs in size, form, and some aspects of operation from ordinary eyeglasses or contact lenses . . . [and] the CCTV adds the technological step of televising an image to a screen where it can be adjusted for size, focus, and contrast." [Doc. 11, Ex. A at 3-4]. Nevertheless, the Council held, a CCTV is encompassed

17

within the meaning of "eyeglasses" because:

> the image first travels through a lens to be focused onto a light-sensitive medium and transmitted electronically. Thus it depends on a lens to serve its function of enlarging images and aiding vision . . . . The Medicare Council finds the CCTV at issue in this case to be a visual aid device that relies on a lens in the same way that eyeglasses do, despite the addition of television technology.

[Doc. 11, Ex. A at 4-5].

As noted above, agency interpretations "contained in formats such as opinion letters are entitled to respect. . . only to the extent that those interpretations have the power to persuade," Christensen v. Harris County, *supra*, 529 U.S. at 587 (internal punctuation omitted), and the weight to be accorded an opinion letter "in a particular case will depend on the thoroughness evidence in its consideration [and] the validity of its reasoning." Rodriguez v. Whiting Farms, Inc., *supra*, at 1189. The Court finds the above reasoning, which relies primarily on dictionary definitions, to be unpersuasive.

The 1965 bill which became the original Medicare Act included the exclusion for "eyeglasses." The legislative history of the 1965 enactment contains the following discussion:

> Payments would not be made for routine physical examinations or for eyeglasses, hearing aids, or the fitting expenses or other costs incurred in connection with their purchase. The committee bill provides a specific exclusion of routine dental care to make clear that the services of dental surgeons covered under the bill are restricted to complex surgical procedures. Thus, payment would be made under the supplementary plan for the physician's services connected with the diagnosis of a specific complaint and the treatment of the ailment, but a routine annual or semiannual checkup would not be covered. Similarly, the diagnosis and treatment by an ophthalmologist of, say, cataracts would be covered

18

>        but the expenses of an eye examination to determine
>        the need for eyeglasses and charges for prescribing and
>        fitting eyeglasses or contact lenses would not be
>        covered. Similarly, too, routine dental treatment--
>        filling, removal, or replacement of teeth or treatment
>        of structures directly supporting teeth-- would not be
>        covered.

S. Rep. No. 89-404 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1989-90.

This language from the legislative history was characterized by one court as an indication of Congressional intent to exclude "routine eye care" from Medicare coverage, while retaining coverage for "medical treatment" necessitated by such major medical events such as cataract conditions. White v. Beal, 555 F.2d 1146, 1151 n.4 (3d Cir. 1977). There is nothing "routine" about CCTV technology, and while millions and millions of individuals wear eye glasses and corrective contact lenses, it is safe to say that such is not true of CCTVs.

In contrast, there is nothing in the legislative history to support the Appeals Council's conclusion that Congress was focusing on the "lens" as the critical factor in determining coverage. Rather, it is apparent that Congress was more concerned with excluding routine eye examinations and eyeglass prescriptions, as these things are discussed in the same paragraph as "routine physical examinations," "fitting expenses" for eyeglasses and hearing aids, and "routine dental treatment." A CCTV may use a lens, but this does not compel the conclusion that Congress intended to equate CCTVs with "eyeglasses" any more than a telescope can be considered eyewear. The Court finds more persuasive the Congressional intent, as expressed in the legislative history, to exclude routine procedures and devices which are unconnected with major medical conditions such as Davidson's macular hemorrhage and degeneration. The Court finds that the Secretary's conclusion that Davidson's CCTV is excluded as an "eyeglasses" expense is arbitrary and capricious, contrary to law

19

and unsupported by the record.

The Court reverses the Secretary's decision to deny Medicare Part B coverage for Davidson's CCTV. The record and the applicable law do not support the conclusion that the CCTV is not a piece of durable medical equipment, not a prosthetic device, and excluded by the "eyeglasses" provision. Giving the Secretary's decision all due deference, the Court will grant Davidson's motion to reverse.

## **Order**

IT IS THEREFORE ORDERED that the final decision of the defendant Secretary denying Medicare Part B coverage for Plaintiff's CCTV, is reversed. This case is remanded to the Secretary with directions that Plaintiff be reimbursed for the CCTV in the manner and to the extent consistent with the Medicare Act and regulations.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge